

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:19cr 281 |
| | ) | |
| THASI LIMITED, | ) | |
| trading as (or doing business as) | ) | |
| THE BRITISH SHOP, LTD., | ) | |
| | ) | |
| Defendant. | ) | |

## STATEMENT OF FACTS

The United States and the defendant, Thasi Limited, trading as (or doing business as) The British Shop, ("TBS"), agree that at trial, the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence:

1. Between in or about February 2013 and April 2018, in Loudoun County, within the Eastern District of Virginia, and elsewhere, defendant TBS, did unlawfully and knowingly import and bring into the United States merchandise contrary to law.

2. Between in or about February 2013 and April 2018, in Loudoun County, within the Eastern District of Virginia, and elsewhere, defendant TBS, did unlawfully and knowingly aid and abet the sale of items that constituted or contained parts of endangered species and other wildlife illegally imported into the United States.

## THE RELEVANT STATUTES

3. The United States and 182 other countries are signatories to a multilateral treaty called the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES") (see 27 U.S.T. 1087, T.I.A.S. 8249). CITES provides a mechanism for regulating international

trade in fish, plant, and wildlife species whose survival is considered threatened by trade. By agreement of the signatories, such fish, plants, and wildlife are placed on one of three appendices, depending on the level of protection needed for the species. International trade in species listed on these appendices is monitored and regulated by permits and quotas. The permit restrictions apply to live and dead specimens, as well as parts and products made in whole or in part from a listed species.

4. Fish, plant, and wildlife species considered to be most in danger of extinction due to trade are listed on Appendix I of CITES. International trade in these species is strictly regulated and commercial trade in them is largely prohibited. Fish, plant, and wildlife species listed in Appendix II of CITES are those that are not necessarily threatened with extinction now, but may become threatened with extinction unless trade is strictly regulated to prevent use incompatible with their survival. Appendix II species may be traded internationally for commercial purposes, but only after a valid permit/certificate is first issued by the exporting country. A CITES re-export permit is then required each time the wildlife transits any subsequent international borders.

5. CITES is implemented in the U.S. by the Endangered Species Act ("ESA"), which directs the U.S. Fish and Wildlife Service to administer CITES (*see* 16 U.S.C. §§ 1537a, 1540(f)), and provides criminal penalties for those who knowingly trade in any specimen contrary to the provisions of CITES, or possess any specimen traded contrary to CITES (*see* 16 U.S.C. §§ 1538(c)(1), 1540(b)(1)).

6. The U.S. Fish and Wildlife Service has promulgated regulations incorporating the specific permit requirements and provisions of CITES and listing the species contained on the CITES appendices, which are found in Title 50 of the Code of Federal Regulations ("C.F.R.") Part 23. Those regulations, along with provisions contained in 50 C.F.R. Parts 13 and 14, dictate the

necessary procedures for importing fish, plants, and wildlife into the U.S. Pursuant to 50 C.F.R. § 23.20(c), importers must have a valid CITES document to engage in international trade in any CITES specimen. Pursuant to 50 C.F.R. § 23.20(e), any import for commercial purposes of an Appendix II species like rosewood must be accompanied by a CITES export permit from the country of origin.

7. The Endangered Species Act ("ESA") was enacted to provide a program for the conservation of endangered and threatened species. Pursuant to 16 U.S.C. § 1538(a)(1)(A), it is unlawful for any person subject to the jurisdiction of the United States to import any endangered species into the United States. Pursuant to 16 U.S.C. § 1538(a)(1)(E), it is unlawful for any person to knowingly deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity, any endangered species. Pursuant to 16 U.S.C. § 1538(a)(1)(F), the ESA makes it unlawful for any person to sell, or offer for sale, an endangered species in interstate commerce. Under the ESA, the term "endangered species" includes any species, or part thereof, included on the "List of Endangered or Threatened Wildlife," found in 50 Code of Federal Regulations ("CFR") Part 17.11.

8. Smalltooth sawfish (*Pristis pectinata*) are listed as "endangered" under 50 CFR 17.11, with U.S. populations being so listed since 2005 and non-U.S. populations being so listed since 2015. See Federal Register ("FR") Notices 70 FR 69464-69466 (2005) and 79 FR 3914-3916 (2015). Largetooth sawfish (*Pristis pristis*) are listed as "endangered" under 50 CFR 17.11 and have been so listed since 2014. See 79 FR 42687, 42696. Green sawfish (*Pristis zijsron*) and narrow sawfish (*Anoxypristis cuspidata*) are listed as "endangered" under 50 CFR 17.11 and have been so listed since 2015. See 79 FR 3914-3916 (2015). A sawfish rostrum is an elongated, boney growth that extends from the upper jaw and contains tooth-like structures. A rostrum resembles

a saw and is often called a blade. All species of sawfish are listed within CITES as Appendix I species.

9. Hawksbill sea turtles (*Eretmochelys imbricate*) are listed as "endangered" under 50 CFR 17.11 and have been so listed since 1970. See 35 FR 8465; 8491-8498 (1970). Green sea turtles (*Chelonia mydas*) are listed as "endangered" or "threatened" (depending on geographic area) under 50 CFR 17.11 and have been so listed since 1978. See 43 FR 32808 (1978). All species of sea turtles are listed within CITES as Appendix I species.

10. Nearly every species of the crocodile family (*Crocodylidae*) are listed as either "endangered" or "threatened" (depending on species and geographic area) under 50 CFR 17.11. Many of which have been listed as such since the 1970s (various FRs). All species of the crocodile family are listed within CITES as either an Appendix I or Appendix II species.

11. The barn owl (*Tyto alba*) is protected by the Migratory Bird Treaty Act, 16 U.S.C. § 703(a), which makes it unlawful to at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill, possess, offer for sale, sell, offer to barter, barter, offer to purchase, purchase, deliver for shipment, ship, export, import, cause to be shipped, exported, or imported, deliver for transportation, transport or cause to be transported, carry or cause to be carried, or receive for shipment, transportation, carriage, or export, any migratory bird, any part, nest, or egg of any such bird, or any product, whether or not manufactured, which consists, or is composed in whole or part, of any such bird or any part, nest, or egg thereof without a permit. Additionally, 16 U.S.C. 707(b)(2) makes it a felony to knowingly sell or offer for sale any migratory bird. The barn owl is listed within CITES as Appendix II species.

12. Pursuant to 16 U.S.C. § 3372(a)(1), the Lacey Act makes it unlawful for a person to import, export, transport, sell, receive, acquire, or purchase any fish or wildlife, taken, possessed, transported, or sold in violation of any United States law or treaty of the United States.

13. Pursuant to 18 U.S.C. § 545, it is unlawful to fraudulently or knowingly import or bring into the United States, any merchandise contrary to law, or receive, conceal, buy, sell, or in any manner facilitate the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law.

I. The Outpost, LLC

14. Between 2012 and 2018, The Outpost, LLC was a Virginia limited liability corporation with a principal office in Upperville, Virginia. The Outpost, LLC was owned by Keith R. Foster ("Foster") and another person. The Outpost, LLC operated a business called The Outpost, in Middleburg, Virginia. The Outpost sold home furniture, antiques, and home décor pieces, including a variety of wildlife mounts and handicrafts made from wildlife parts. No later than 2012, Foster was fully aware of CITES and ESA requirements related to the international shipment of wildlife for commercial purposes.

15. Since the time The Outpost LLC was founded, Foster made multiple trips abroad each year to purchase items later to be sold at The Outpost. Between 2012 and 2018, Foster imported at least 35 separate shipments of merchandise for resale at The Outpost, which contained wildlife and wildlife parts. The wildlife within those shipments was not properly declared to the U.S. Fish and Wildlife Service upon import. To conceal the existence of wildlife pieces in the shipments, such wildlife pieces were, at Foster's direction, often labeled in a generic manner that failed to signal the true nature of the items.

16. In December 2016, The Outpost offered for sale numerous wildlife pieces, including Endangered Species Act items such as a sawfish blade, crocodile skin wallets and flasks, and handicrafts made of sea turtle shell. Foster told a customer ("Customer") that the sawfish blade was from England. Foster emailed Customer that Foster purchased six sawfish blades in 2016, while in England, and sold four of them. Foster stated he imported an additional two sawfish blades on or about November 2016. Foster offered to sell the sawfish blade for $1,000.

17. In December 2016, Foster wrote Customer that the sawfish blade presently offered for sale was the last that he had, but that he planned to return to England and purchase three more sawfish blades. Foster wrote "they are extremely difficult to bring in States by the way."

18. On December 21, 2016, Customer purchased one sawfish blade for $1,000.

19. On January 4, 2017, a courier for Customer ("Courier") visited The Outpost to pick up items previously purchased by Customer. During the visit, Employee told Courier that the sawfish blade was from England, and had been previously purchased and imported by Foster. Employee said that nearly everything at The Outpost was foreign and imported directly by The Outpost. Employee stated that The Outpost recently sold mounted hawks, falcons, and owls.

20. Employee showed Courier numerous wildlife items for sale, including crocodile skin items that, according to the employee, The Outpost had "to smuggle in." Employee said that The Outpost has "only ever had one thing caught, which I think is pretty good" considering the "interesting things we import." Employee also talked about other smuggled illicit wildlife including ivory pieces. Employee explained that The Outpost primarily imports wildlife pieces via cargo container, and that the shipping company used by The Outpost often conceals and hides items within cargo containers in order to smuggle said items into the United States.

21. In reference to the sawfish blade, Foster told Customer in a telephone call in January 2017, that, "In truth I shouldn't be bringing those in. . . . I mean, Fish and Wildlife, if they opened up that, and found it, you know, they would confiscate my whole container...so that's a problem." Foster continued by saying, "and even if you try and get a CITES [permit], you just can't."

22. Foster told Customer that, last year, Foster purchased six sawfish blades which he subsequently smuggled into the United States and sold, and that he planned to return to England to purchase more and bring them in among one of his four to five cargo shipments he receives every year. Foster said, "If I don't get it [the sawfish blades] on my first shipment, I'll certainly get it on my second." Foster told Customer that he has pre-ordered sawfish blades from a collector in England and stated "rest assured. I'm gonna bring more in. Cause I'm the only fool in the States that probably wants to risk it." Foster told Customer that he has previously imported tortoise shells, up to 36 inches in size, and stated, "They're endangered, so you know, they're a problem bringing those in."

23. Foster told Customer how he smuggled wildlife via cargo containers, and stated, "I can hide it. I hate to say it this way, but I can hide, through my shipper, you know, some of this." Foster explained that items like the sawfish blades are wrapped and boxed in a way that conceals them so "you're not going to find it and nothing is going to happen to it."

24. On January 13, 2017, Customer visited The Outpost. During the visit, Employee showed Customer numerous wildlife pieces for sale, including wildlife protected by the Endangered Species Act, such as tortoiseshell and sea turtle pieces, and pieces made from crocodile skin. Employee told Customer that The Outpost smuggled the sea turtle and crocodile pieces into the United States, because the items are protected and prohibited from importing.

During the visit, Customer purchased for $1,073, a box made from sea turtle shell, a flask and a case made from crocodile skin, and a duster made from ostrich feathers.

25. On January 14, 2017, Foster emailed Customer that Foster was "sure I will be able to buy a couple of Sawfish blades."

26. In a telephone call on February 20, 2017, Employee told Customer that Foster recently purchased two sawfish blades in England that he planned to import in an upcoming March cargo container shipment. Employee told Customer that, in order to get highly regulated wildlife into the United States, Foster works with a shipping company to label the wildlife items falsely. Employee stated that, if a package contained a tortoise shell, it would be boxed and labeled as a wall sconce. Employee told Customer that, in order to smuggle sawfish blades into the United States, Foster and the shipping company call them "decorative trophies" on the manifest paperwork.

27. On March 4, 2017, Foster emailed a customer that a mounted grey heron advertised for sale on The Outpost website was a real heron, and available for purchase for $975. Foster further stated that the heron was purchased "quietly" from a collector in England, and that The Outpost had multiple taxidermy cases for sale.

28. On March 9, 2017, U.S. Fish and Wildlife Service agents inspected a 40-foot cargo container in Norfolk, Virginia. The container housed items imported into the United States from Southampton, England, and belonging to The Outpost. During the inspection, investigators found approximately 100 undeclared wildlife items contained within boxes inside the container. Many of the undeclared items were protected by the Endangered Species Act and CITES, including numerous pieces made from sea turtle shell, crocodile, and coral, as well as mounted birds of prey and mounted African animal trophies. The wildlife items were marked

and repackaged, and allowed to enter the United States and be transported to The Outpost. The invoice for the items in the container was prepared by a British company, but none of the wildlife observed by the agents was listed on the invoice.

29. On March 23, 2017, Employee emailed Customer an offer to sell two pieces made from sea turtle shell for $415. The email included photographs of the two pieces, which had been covertly marked during the March 9th inspection.

30. On April 6, 2017, Employee emailed Customer notice that two sawfish blades arrived on The Outpost's second cargo shipment and were available for purchase. By phone, Employee told Customer that the second shipment contained smuggled wildlife, including sawfish blades, crocodile skin bags, and numerous African animal mounts. Employee then sent Customer numerous photographs via text message of various wildlife items for sale at The Outpost. These photographs included several wildlife items previously seen during the March 9th inspection of the 40-foot container, as well as new wildlife items brought into the United States through a different cargo container on or about March 29, 2017.

31. On April 6, 2017, Customer received an email from The Outpost, stating that the second shipment of the year had just arrived. The email contained several photographs of wildlife items for sale at The Outpost, including several wildlife items previously seen during the March 9th inspection, as well as new wildlife items brought into the United States through a different cargo container on or about March 29, 2017.

32. On April 12, 2017, Customer visited The Outpost and met with Foster and Employee. During the visit, Foster and Employee showed Customer numerous wildlife pieces for sale, including sawfish blades, turtle shell, ivory, zebra hide, crocodile, and various birds and bird parts. Foster told Customer about smuggling wildlife, about lacking the proper CITES permits

to purchase, export, and later import some protected wildlife, and about the dangers of being caught by United States Customs. For $5,420, Customer purchased three sawfish blades, one mounted barn owl, one jar made from sea turtle shell, one turtle shell box, one African antelope mount, and one porcupine quill box.

33. The sea turtle and tortoise pieces, the barn owl, the African antelope, and the porcupine quill box all had been covertly marked by agents during the March 9th inspection of the cargo container. Foster told Customer that two of the sawfish blades were smuggled in the second container which arrived into the United States on or around March 29, 2017 at a port in New York, and then transported to Virginia. Foster said that the third sawfish blade had been imported in 2016.

34. On November 17, 2017, U.S. Fish and Wildlife Service agents searched The Outpost, a related location controlled by Foster and The Outpost, LLC, known as the "Keep", and Foster's residence. During the searches, agents observed and seized over 100 items, including items protected by the ESA, the Migratory Bird Treaty Act, and CITES, all of which were previously imported into the U.S. contrary to law.

II. <u>The British Shop, Ltd..</u>

35. The British Shop, Ltd., , and sometimes known as "TBS", is a worldwide freight forwarding company based in Great Britain, that specializes in the shipment of high-end furniture, antiques, and artwork. TBS is headquartered in Langley, England, with an additional office in Walsall, England.

36. The director and president of TBS is an individual referred to herein as "SW," a British citizen. TBS employs an account manager referred to herein as "NB," who serves as

office manager at the TBS warehouse in Langley, England. TBS employs about forty (40) workers in England, who help collect and pack goods for shipment to the United States.

37. TBS employees in England handle client merchandise prior to shipment. TBS warehouse employees often collect items from merchants, transport those items to a TBS warehouse, package those items for international transport, load multiple individual pieces into large boxes for shipment, and then pack those boxes into sea cargo or air cargo containers.

38. When acting lawfully, TBS should use the sales invoice supplied by its client as the source of information for preparing a Customs Invoice / Packing List for each shipment. Shipments leaving England that contain CITES pieces are required to have the proper CITES documentation, to be presented to Customs. Any non-CITES wildlife pieces should be accurately listed on the invoices presented to Customs.

39. On February 23, 2018, U.S. Fish and Wildlife Service agents interviewed SW at the TBS office in New Jersey. During the interview, SW explained his knowledge of relevant laws related to the international shipment of wildlife, to include the Lacey Act and CITES, as well as wildlife declaration requirements. SW has been in the shipping industry working with CITES items for about 20 years; for most of that time, SW served as president of TBS.

40. SW said that shipping wildlife means extra costs for CITES permits, which means extra costs for TBS and for the U.S. broker TBS uses. SW said that TBS charges clients an extra fee when shipping CITES pieces for "the headache of dealing with it."

41. When TBS is presented with non-CITES wildlife pieces for shipment, TBS properly should ask for the genus information from the dealer who sold the piece. This is done in order to determine if the piece requires a CITES permit or not. If the wildlife piece is a non-CITES item, then the piece should be shipped "as is" unless the broker spoke up about it. In order for the

broker to know what it is receiving, TBS prepares a Customs Invoice. TBS uses the supplier invoices provided by their clients to generate that manifest. Essentially, SW explained, TBS directly copies the information from the supplier invoices into the TBS system and the descriptions of the items from the supplier invoices should identically match the TBS shipment manifest which is then provided to the broker. SW then stated that if the shipment manifest was inaccurate for any reason, the U.S. customs broker would have no idea, as the broker is forced to go by the documents provided by TBS.

### III. Defendant's Conduct

42. Beginning around February 2013, Foster started using TBS to ship wildlife items and other merchandise from England to the United States. Those items were sourced in England, as well as in Europe and sometimes even Africa, directly by Foster and his staff. Foster made multiple buying trips abroad each year to source and purchase items in foreign commerce, which he would then import into the United States and sell at The Outpost.

43. Between 2013 and 2018, TBS (on behalf of Foster) shipped from England to the United States at least 35 separate cargo shipments of merchandise for resale at The Outpost, which contained wildlife and wildlife parts of a market value that was more than $250,000 but less than $500,000. The wildlife within those shipments was not properly declared to the U.S. Fish and Wildlife Service upon import. To conceal the existence of wildlife pieces in the shipments, such wildlife pieces were, at Foster's direction, often labeled by TBS employees in a generic manner that failed to signal the true nature of the items.

44. When Foster shipped goods using TBS, he would either have his merchandise collected by TBS staff, or have the items dropped off or shipped to TBS locations in England. Occasionally Foster would even drop the items off himself at a TBS warehouse. Along with

providing TBS with the items to be shipped, Foster would provide TBS with sales receipts for each item, which often included a description of the item itself, and some receipts even had photographs of wildlife items. TBS would use those receipts provided by Foster or the merchant to generate a "Collection Note" and/or a "Hand In Note", which was an internal document that TBS used to then generate a "Customs Invoice / Packing List" for each of its outbound shipments.

45. TBS would then provide the Customs Invoice / Packing List to British and U.S. Customs officials, as well as to a customs broker in the U.S., who would act on behalf of TBS in dealing with U.S. Customs authorities. Therefore, any customs official who wanted to know exactly what a TBS shipment contained would reference the Customs Invoice / Packing List. The last page of every TBS Customs Invoice / Packing List states "To the best of our knowledge and belief the above information is true and correct. For and on behalf of The British Shop."

46. In November 2018, Foster stated that on several occasions between 2013 and 2017, he had detailed discussions with TBS employee NB about how a particular item would be labeled on TBS customs invoices. Foster stated that these discussions always revolved around endangered species and other wildlife items that Foster knew were CITES protected and therefore knew would be impossible to import if they were properly labeled on customs invoices. Foster recalled one such conversation, where Foster called NB about a large turtle or tortoise carapace (shell) that Foster knew was endangered and therefore illegal to import into the U.S. Foster stated that he called NB from the antique store while shopping, and asked NB whether the item could be brought into the United States. Foster then said NB told him she would take care of it. In this particular instance, Foster explained that he purchased the turtle shell, imported it, and later sold it.

47. During the same interview, Foster said he often called NB in similar situations when purchasing other protected wildlife such as sawfish blades and tortoiseshell pieces.

48. Foster said that in 2015 and 2016, he met with a merchant in England to discuss purchasing sawfish blades and turtle shells and how to import them into the United States. The merchant told Foster "you can't get sawfish blades into the States" and "there is no way to import turtle or tortoise shells into the States." Foster said that, when he purchased one sawfish blade, the blade was picked up from the merchant directly by a TBS employee. Foster stated that he and NB discussed how to invoice the sawfish blade. Foster said that NB assured him that she would take care of it.

49. With respect to 281 Customs Invoices that TBS provided to U.S. Customs officials between February 2013 and April 2018, TBS made false statements to hide the fact that Foster was importing 434 items of wildlife. TBS imported even higher numbers of wildlife without any mention on Customs Invoices.

50. TBS staff members were responsible for manifesting items for international shipment on a Customs Invoice / Packing List, after consulting with Foster and referencing supplied receipts. Within 22 shipments between 2013 and 2017, investigators found approximately 281 separate entries where a false record was created by TBS staff in order to conceal wildlife.

51. Those 281 separate entries included both omissions and false statements. However, all had in common the fact that simply by going by the entry listed on the Customs Invoice, it would have been extremely difficult to impossible for any customs official or Fish and Wildlife official to determine that wildlife existed within the shipment. In the representative samples listed below, the information on the left side of the table is what was listed on the corresponding TBS Customs Invoice for that particular shipment, which TBS provided to U.S Customs. For

each example the true nature of the item and the wildlife it was made from was clearly listed on the receipt Foster provided to TBS, yet TBS did not list that information on the Customs Invoice.

*March 2017 – Shipment No. 36256*

| Item | TBS Invoiced Item As | Material | Wildlife | ESA Protected | CITES |
|---|---|---|---|---|---|
| 130 | RUG | Leather | Zebra | Possibly | Possibly |
| 154 | BLADE ORNAMENT | Oak | Sawfish | Yes | Yes |
| 92 | COIN PURSE | Silver | Crocodile | Yes | Yes |
| 162 | SUITCASES | Leather | Crocodile | Yes | Yes |
| 117 | CAKE KNIVES | Steel | Pearl | No | No |
| 73 | VICTORIAN ORNAMENT | Mahogany | Buffalo | No | No |

*February 2016 – Shipment No. 30776*

| Item | TBS Invoiced Item As | Material | Wildlife | ESA Protected | CITES |
|---|---|---|---|---|---|
| 91 | CIGAR CASE | Leather | Crocodile | Yes | Yes |
| 242 | LIBRARY BOOKCASE | Wood | Rosewood | Yes | Yes |
| 28 | GLADSTONE BAGS | Leather | Crocodile | Yes | Yes |
| 280 | MAGNIFYING GLASS | Metal; Glass | Sea Turtle | Yes | Yes |
| 573 | WALL PLAQUES | Wood | Sawfish | Yes | Yes |
| 153 | ORNAMENTS | Wood | Kudu | No | No |

*February 2015 – Shipment No. 26826*

| Item | TBS Invoiced Item As | Material | Wildlife | ESA Protected | CITES |
|---|---|---|---|---|---|
| 258 | QUILL BOX | Wood | Porcupine | No | No |
| 107 | SPRING BOK TROPHIES | Metal | Springbok | No | No |
| 89 | FLASK | Silver | Crocodile | Yes | Yes |
| 278 | BLADE ON STAND | Metal; Wood | Sawfish | Yes | Yes |
| 100 | TABLES | Wood | Zebra | Possibly | Possibly |
| 25 | BREAKFAST TABLE | Wood | Rosewood | Yes | Yes |

*July 2014 – Shipment No. 24895*

| Item | TBS Invoiced Item As | Material | Wildlife | ESA Protected | CITES |
|---|---|---|---|---|---|
| 149 | BLADE | Wood | Sawfish | Yes | Yes |
| 159 | CARVED ARMORIAL | Wood | Elk | No | No |
| 206 | EGG ORNAMENTS | Ceramic | Ostrich | Possibly | Possibly |
| 278 | MAGNIFYING LENS | Metal; Wood | Deer | No | No |
| 98 | GONG | Metal; Wood | Deer | No | No |

*February 2013 – Shipment No. 20111*

| Item | TBS Invoiced Item As | Material | Wildlife | ESA Protected | CITES |
|---|---|---|---|---|---|
| 266 | TROPHIES | Wood | Various antlers | Possibly | Possibly |
| 130 | LATE VICTORIAN MOUNT | Wood | Sawfish | Yes | Yes |
| 155 | HUNTING TROPHY | Wood | Kudu | No | No |
| 134 | TEA CADDY | Leather | Stingray | No | Possibly |

52. TBS records for The Outpost shipments included a receipt dated July 10, 2014, from an antique store in Tetbury, England for a "wall ornament." The receipt showed Foster paid £1,100 (approximately $1,793) for a "wall ornament." The TBS collection note stated "Wall Ornament" and contained a hand-written note, highlighted, that said "Turtle Shell."

53. The "Turtle Shell" item was collected as part of shipment 24895, but did not ship in July 2014 in that shipment. Instead, it remained at the TBS warehouse for two months, and was shipped separately as part of shipment 24895. The Customs Invoice for shipment 24895 listed the item 17 as a "Wall Ornament" made of "wood", and made no reference to "Turtle Shell."

54. On numerous occasions, TBS used the words "ornament" or "ornaments"; "trophy" or "trophies"; and "display case" or "display cases" on TBS Customs Invoices. Most of the time, those entries actually were linked to wildlife items such as sawfish blades, mounted birds of prey, and hunting mounts made from deer, elk, antelope, buffalo, and various other game animals. The words "box" or "case" often were used for wildlife items made from crocodile or sea turtle.

### A. March 2017 Container Inspection

55. As noted above, on March 9, 2017, agents of the Fish and Wildlife Service and wildlife inspectors inspected a 40-foot cargo container in Norfolk, Virginia, imported into the United States from England, and belonging to The Outpost.

56. The invoice paperwork for the container included a 37-page Customs Invoice / Packing List, prepared by TBS, detailing the contents of the container, which were reported to be 277 pieces of miscellaneous furniture, antiques, and household decorations. No wildlife items were listed on the packing list, no wildlife was declared to be in the shipment, and no accompanying wildlife permits were submitted upon arrival into the U.S.

57. During the March 9th inspection, Fish and Wildlife investigators found approximately 100 undeclared wildlife items contained within boxes inside the container. Many of the undeclared items were protected by the Endangered Species Act and CITES, including numerous pieces made from sea turtle shell, crocodile, and coral, as well as mounted birds of prey and mounted African animal trophies. Agents and inspectors observed that none of the boxes or crates within the container were labeled as containing wildlife.

58. The boxes within the container had handwritten notes on the outside of the box, which listed the box number and listed item numbers which corresponded with the items located inside the box. Many of the pieces were labeled with a TBS sticker that contained the phrase "K. FOSTER – OUTPOST" or "K. FOSTER – KEEP" and an item number. The item number corresponded to an item number and item description listed on the shipping manifest created by TBS. Many of the wildlife pieces were also labeled with a sticker that listed a name for the item, a price in pounds sterling, and a date.

59. Many wildlife pieces within the container were not labeled at all, and bore no apparent link to any entry on the Customs Invoice. Those pieces were predominately highly-protected items that appeared to be made of sea turtle (*Chelonioidea*) and/or tortoise (*Testudinidae*) shell, coral (*Anthozoa*), and crocodile (*Crocodylus sp.*).

60. TBS shipping records and purchase receipts for the March 9th shipment reflected at least 33 entries within the invoice paperwork that contained false records related to wildlife. In those 33 instances, receipts provided by Foster to TBS clearly spelled out that the items in question were made from wildlife. However, in preparing the Collection Notes and the Customs Invoice / Packing List for the shipment, TBS staff omitted the wildlife terminology, thus making it appear that the shipment did not contain any wildlife whatsoever.

61. For example, within the March 9th shipment, item 113 was listed on the Customs Invoice as "Candlesticks by Anthony Redmile" made of "silver plate." The items were listed the same way on the TBS Collection Note. However, the sales receipt provided by Foster to TBS stated that the items were made from "Ostrich Eggs." Within the same shipment, a sales receipt stated "Antelope Horns" but the Customs Invoice prepared by TBS described the item (item 585) as a "Wall Plaque" made of "Oak."

62. Of the more than 100 wildlife items within the container, many were easily identifiable as wildlife, including a mounted kestrel and a mounted barn owl; numerous animal skulls and horns; and numerous items made from wildlife such as crocodile covered flasks and tortoiseshell jars. An item of CITES protected coral had hang tags on the it that said "Coral Specimen." A mounted barn owl had a TBS sticker affixed to it that stated "Barn Owl" and even listed the scientific name "Tyto Alba " (See exhibit 1a and 1b).



Exhibit 1a



Exhibit 1b

63. Many of the wildlife items within the March 9th shipment were easily recognizable as wildlife, even to a lay person. Those engaged in the international shipment of goods, should have clearly been able to determine that items within the March 9th shipment were made from protected and non-protected wildlife. By packing the items in unmarked boxes and by not listing any wildlife on the Customs Invoice, TBS employees caused the wildlife within the shipment to be concealed. Thus, had the shipment not been completely inspected, it would have been impossible to know it contained wildlife.

This statement of facts includes those facts necessary to support the plea agreement between the defendant and the United States. It does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By: _____
Gordon D. Kromberg
Assistant United States Attorney

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, Thasi Limited, trading as (or doing business as) The British Shop, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
Simon Williams
For Thasi Limited, trading as (or doing business as)
The British Shop

I am defendant's attorney. I have carefully reviewed the above Statement of Facts with it. To my knowledge, its decision to stipulate to these facts is an informed and voluntary one.

_____
Benjamin L. Hatch
Attorney for Thasi Limited, trading as
(or doing business as) The British Shop